

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **03 C 6786** | **DATE** | Oct. 7, 2004 |
| **CASE TITLE** | Catherine Johnson    v    Long Term Disability Plan, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DO**June 14, 2004**CKET ENTRY:**

(1) ☐  Filed motion of [ use listing in "Motion" box above.]

(2) ☐  Brief in support of motion due _____.

(3) ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐  Hearing

(5) ☐  Status hearing set for

(6) ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐  Trial[set for/re-set for] on _____ at _____.

(8) ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]   Memorandum Opinion and order entered.   Accordingly, plaintiff's motion for summary judgment is denied.  Defendant's motion for summary judgment is granted.

(11) ☐  [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| X | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | | OCT 0 8 2004 date docketed |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | | date mailed notice |
| GDS | courtroom deputy's initials | | mailing deputy initials |

U.S. DISTRICT COURT CLERK'S
2004 OCT -7 PM 4:20
Date/time received in central Clerk's Office

Document Number

38

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 6786 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| LONG TERM DISABILITY PLAN and IMC | ) | |
| GLOBAL, INC., | ) | |
| | ) | **DOCKETED** |
| Defendants. | ) | |
| | | OCT 0 8 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Catherine Johnson has filed suit against her former employer, IMC Global, Inc.

("IMC") and its Long Term Disability Plan (together "defendant") under § 502(a)(1)(B) of the

Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover

long term disability benefits denied to her. The parties have filed cross motions for summary

judgment, agreeing that the material facts are not in dispute and that the court should decide the

case on the record presented. For the reasons set forth below, defendant's motion for summary

judgment is granted, plaintiff's motion is denied, and the decision to deny benefits is affirmed.

## BACKGROUND

IMC sponsors an ERISA-governed life, health and disability benefits plan for its salaried

and nonunion hourly employees (the "Plan"). Defendant Long Term Disability Plan is one part

of the Plan. The Plan is self-funded from the assets of IMC, which serves as administrator, is a

fiduciary, and is the named fiduciary under § 402 of ERISA. As part of the Plan, participants

may qualify for Short Term Disability ("STD") benefits and Long Term Disability ("LTD")

38

benefits. For the first 30 months of any period of disability during which STD or LTD benefits are received, disability is defined as "the inability to perform all the material duties of your occupation, or another occupation offered by IMC due to illness or injury." For any disability lasting more than 30 months due to the original disabling condition, the participant must be unable to perform all the important duties of any job the participant could be reasonably expected to perform, including jobs that require training for qualification. IMC is not required to be the company offering another job or training after 30 months.

Prior to August 22, 2002, the Plan included a "Proper Care and Treatment" provision, under which the Plan could terminate benefits "if you no longer attempt to follow your physician's instructions regarding your disabling condition." On August 22, 2002, the proper care and treatment provision was amended to read, "If you are on LTD, you are required to be under the care of a qualified health care provider. If you refuse treatment to improve your condition, or if other efforts to enable a return to work are refused, your LTD benefits will terminate." The Plan further provides that "If you cease to be disabled by the condition that originally disabled you, benefits will stop even if you are disabled by a different condition, if that second condition occurred after the original disabling condition."[1]

IMC serves as Plan Administrator, and in that capacity is invested with full and complete authority, responsibility and control over the management, administration and operation of the Plan. Under the terms of the Plan, that authority includes the power to:

---

[1] At oral argument, defendant's counsel acknowledged that the provision addressed only subsequent disabling conditions that originated while a participant was on LTD and not working.

(a) construe and interpret the Plan, to decide all questions of Plan eligibility, to determine the amount, manner and time of payment of any benefits under the Plan, and to remedy ambiguities, inconsistencies, or omissions in Plan terms and/or administration;

* * *

(c) make determinations as to the right of any person to a benefit, to afford any person dissatisfied with such determination the right to a hearing thereon, and to direct payments or distributions from the trust fund in accordance with the provisions of the Plan; and

(d) Decide all questions arising under the plan.

IMC has delegated the authority to decide claims and appeals to its claim administrators or insurance companies. IMC and the claims administrators share the duties of administering the Plan. Initial determinations of eligibility under the LTD Plan are made by Hartford Life Insurance Company ("Hartford") as claims administrator.

The Plan provides for a two-level administrative review process. The first level appeals of LTD benefit decisions are conducted by CorVel Corporation ("CorVel") on behalf of IMC. If the first level appeal is denied, a participant may make a second level appeal to an Employee Benefits Committee ("Benefits Committee") which was created by IMC to assist in administration of the Plan. The Benefits Committee is delegated with the power to interpret Plan documents and the responsibility of ensuring that the plan is operated in a manner that is fair to all Plan participants.

All determinations of Employee Benefits Committee in any matter arising under the Plan, including questions of construction and interpretation, shall be final, binding and conclusive upon all interested parties, and shall be given the maximum possible deference allowed by law.

Plaintiff first stopped actively working at IMC on January 15, 2001. One month later, on February 10, 2001, Dr. Kenneth R. Margules diagnosed plaintiff with systemic lupus

3

erythematosus ("lupus" or "SLE"). In a letter to IMC Dr. Margules listed plaintiff's specific limitations affecting her ability to work as profound fatigue and joint pain, reporting that plaintiff is beset by profound fatigue, Raynaud's Phenomenon, and joint pain with morning stiffness. Based on the information provided, including the diagnosis of lupus, Hartford approved plaintiff's STD benefits.

Plaintiff received STD benefits from January 15 through April 22, 2001. She returned to work on April 23, 2001, her lupus having improved, but then permanently ceased working at IMC after May 14, 2001, when her condition worsened.

In June 2001 Hartford wrote plaintiff informing her that to extend her benefits past July 3, 2001, her physician needed to supply a letter indicating her current condition, treatment, restrictions/limitations and expected return to work date. The following month, Hartford again wrote plaintiff to inform her that her STD benefits were set to expire on August 8, 2001. Enclosed with the letter was a "Long Term Disability Income Benefits Questionnaire" to begin plaintiff's application for LTD benefits. Hartford again informed plaintiff that she needed to provide a detailed update from her attending physician with regard to her current condition, treatment plan, restrictions and prognosis for returning to work. Plaintiff submitted that questionnaire on July 18, 2001, in which she listed Dr. Margules as the physician providing the first medical attention for her current disability. Plaintiff also listed that she had consulted with Dr. Lana Peters, whom she had seen on referral from Dr. Margules in September 2000. Plaintiff had two out-patient visits with Dr. Peters, Phd., a psychotherapist, who gave a provisional diagnosis of "Depressive Disorder NOS" (not otherwise specified) and recommended continued treatment with antidepressant medication and outpatient psychotherapy.

4

Despite this recommendation, plaintiff did not see another mental health care provider for ten months, when she saw Dr. James Marks, a psychiatrist on July 20, 2001. Dr. Marks diagnosed plaintiff with dysthymia, a disorder with similar but longer-lasting and milder symptoms than clinical depression, and suggested that she return to see Dr. Peters for psychotherapy. Dr. Marks scheduled a return visit for three weeks later and planned to continue managing plaintiff's psychiatric pharmacologic treatment on a regular basis. Plaintiff never returned to Dr. Marks.

On September 10, 2001, Dr. Margules completed an Attending Physician Statement of Disability. In that statement, Dr. Margules listed plaintiff's primary diagnosis as depression, with a secondary diagnosis of lupus, and noted that plaintiff had retrogressed. Dr. Margules also indicated that plaintiff was "impaired by arthralgia of small joints of hands, weakness, lassitude, and by feelings of emptiness and non-value of life.

On September 24, 2001, a Hartford benefits examiner, Terrian Weyer noted symptoms of lupus and Raynaud's syndrome, both of which can cause significant depression. Weyer also determined that plaintiff was "co-morbid" for physical and mental nervous symptoms and that she had a high risk of depression for her physical illness. On October 1, 2001, Hartford approved plaintiff for LTD benefits.

Three months later Hartford wrote plaintiff requesting an "Attending Physician's Statement of Physical Capacities Evaluation Form." Dr. Margules submitted that form on February 22, 2002, indicating plaintiff's primary diagnosis as depression, with a secondary diagnosis of lupus, and no other disabling condition. After receiving that statement of continued disability, Hartford noted that plaintiff's depression was the primary disabling factor. As a result,

Hartford changed the focus of its review to plaintiff's treatment of the depression both through therapy and medication.

On February 26, 2002, Hartford called plaintiff, inquiring about whether plaintiff was receiving treatment for the depression. Plaintiff indicated that she was no longer seeing Dr. Peters but that she would find another mental health care provider.

The following month, on March 14, 2002, plaintiff had an initial visit with Lila Cunningham, a therapist at Covenant Behavioral Health, a clinic in Wisconsin. On that visit, Cunningham filled out an outpatient treatment form specifying six follow-up sessions of psychotherapy. Plaintiff next saw Dr. Ilva Van Valkenburgh, a doctor at Covenant Behavioral Health, for another psychiatric evaluation. Dr. Van Valkenburgh filled out a Psychiatric Attending Physician's Statement of Disability, indicating that she diagnosed plaintiff with major depressive disorder and recommended that plaintiff return once a month for treatment. Dr. Van Valkenburgh's assessment noted that there were no occupational tasks that plaintiff was capable of performing at that time, but that she expected that plaintiff's limitations would last only about two months. Dr. Van Valkenburgh recommended that because plaintiff's mood disorder responded to treatment, she should return to work part time at first and increase to full time over two months.

On May 15, 2002, plaintiff had a routine medication management appointment with Dr. Van Valkenburgh who, at that time, noted that plaintiff's condition was starting to improve. Plaintiff was scheduled for a follow-up visit six weeks later, but never again returned to Dr. Van Valkenburgh.

In June 2002, plaintiff made a second visit to Lila Cunningham. Because the clinic was closing, the two discussed plaintiff's continued treatment with other therapists, but plaintiff preferred to wait to hear where Ms. Cunningham would relocate. Plaintiff never saw Ms. Cunningham again.

Following her visit to Ms. Cunningham, a Hartford reviewer noted in plaintiff's file that it appeared that plaintiff was no longer experiencing lupus flair-ups, and was showing improvement in her depression. The reviewer indicated that a referral to the medical advisory group review ("MAG") and to a behavioral health case manager ("BHCM") would be beneficial in determining plaintiff's primary disabling condition and its severity.

Dr. William Sniger, a medical consultant with the MAG, was asked to review plaintiff's medical record and speak with her physicians to determine plaintiff's functional capacity to perform her sedentary job. Dr. Sniger spoke with Dr. Margules in late June 2002 regarding plaintiff's condition. Dr. Margules reported that plaintiff's lupus had "markedly improved," but that she continued to have major psychiatric and social issues and was in need of psychiatric treatment. Dr. Margules said plaintiff was able to return to sedentary work with regard to her lupus, but that she was unable to perform sedentary work from a psychiatric perspective. After reviewing plaintiff's medical records, Dr. Sniger agreed with Dr. Margules that from a physical perspective, the objective evidence did not support a conclusion that plaintiff's lupus prevented her from performing her job. He stated that the evidence indicated that the primary diagnosis was mental/nervous, and thus recommended that plaintiff's case be referred to a BHCM.

Hartford referred plaintiff's file to Diane Budlong, a BHCM specializing in psychological and related conditions. In late July and early August 2002 Budlong contacted Dr. Margules, Dr.

Van Valkenburgh, and Ms. Cunningham regarding plaintiff's clinical information. Dr. Margules reported to Ms. Budlong that plaintiff's lupus had improved with medication and, when asked about plaintiff's ability to return to work, indicated that "physically in the office, there's nothing to prevent her. My guess is there's something mentally wrong."

Dr. Van Valkenburgh indicated that she did not remember all the details of plaintiff's condition, "since she last saw her in May and had only seen her twice." Dr. Van Valkenburgh did not comment on plaintiff's ability to return to work, indicating that she didn't evaluate her for that. Ms. Cunningham indicated that she was concerned with plaintiff's unwillingness to follow through with sessions, and that plaintiff was relying on medication. Cunningham also indicated that, although she had no real evidence to support her view, she believed that plaintiff would benefit from a work hardening program because plaintiff was the type of person who needed to find out what she could do.

Based on her review of this information, Budlong concluded that no substantive information suggested a psychiatric impairment precluding plaintiff from returning to work if plaintiff was motivated. As a result, on September 1, 2002, Hartford informed plaintiff that she no longer met the Plan's definition of "disabled" and terminated her LTD benefits. Specifically, Hartford found that plaintiff's lupus no longer prevented her from returning to work, and that she had failed to follow up on treatment with multiple mental health care providers. According to Hartford, no doctor had provided any examples of difficulty with concentration, or clinical observations or behavioral examples of psychiatric impairment that would prevent plaintiff from performing her job.

Plaintiff appealed Hartford's decision and, according to Plan procedures, her file was referred to CorVel for the first level appeal. CorVel noted that the file contained no reports of any continued medical, psychological or psychiatric treatment since June 2002. Based on its review of the entire file, CorVel determined that the documentation did not support overturning the denial of plaintiff's disability benefits. Specifically, CorVel noted that both Dr. Sniger and Dr. Margules determined that lupus was not preventing plaintiff from returning to work, and that although Dr. Van Valkenburgh had failed to evaluate plaintiff for return to work in May 2002, the doctor said that she believed in April 2002 that plaintiff should be able to return to work in two months.

On January 31, 2003, plaintiff's counsel sent a letter to Hartford requesting documentation to prepare plaintiff's second level appeal. That letter indicated that "in addition to lupus and Raynaud's, Dr. Margules is treating plaintiff for uncontrolled hypertension . . .."

On February 5, 2003, IMC wrote plaintiff informing her of the denial of her first level appeal and listing February 5, 2003, as the date plaintiff's employment with IMC would be terminated. Plaintiff was informed that the services of IMC's employee assistance program ("EAP") under which IMC's employees are offered psychiatric and other care at no charge, would remain available to her and her eligible dependents for up to six months following that date.

Plaintiff submitted her second appeal on April 9, 2003. In that appeal, plaintiff objected to the decision terminating her disability benefits on the grounds that it was reached without benefit of any examination and was the result of the failure to consider both physical and mental impairments in combination. The appeal letter indicated that Dr. Van Valkenburgh was no

longer treating plaintiff but that Ms. Peters was treating her. Plaintiff included Dr. Peters' notes, which stated that Dr. Peters, who had last seen plaintiff in September 2000, had now seen plaintiff two additional times. The first visit was on February 19, 2003, two weeks after the letter denying plaintiff's first level appeal, and the second visit, for out-patient psychotherapy was on April 2, 2003, a week before plaintiff submitted her second level appeal. Dr. Peters' report indicated that plaintiff had told her that she had made only a few visits to Covenant Behavioral Health Clinic because she did not feel this helped.

Plaintiff also included a mental impairment questionnaire filled out by Dr. Peters. In that questionnaire, Dr. Peters indicated that she was unable to determine plaintiff's response to treatment after two visits, but listed plaintiff's prognosis as good. Also included with plaintiff's appeal was a report from Dr. Dana Trotter, whom plaintiff had seen at the request of the Social Security Administration. In that report, Dr. Trotter diagnosed plaintiff with "severe fibromyalgia," but gave no prognosis of plaintiff's possible return to work. Dr. Trotter also reported plaintiff as having severe Raynaud's and livedo reticularis.

Plaintiff's April 9, 2003, appeal letter was the first time IMC was notified of a diagnosis of fibromyalgia, although plaintiff had been complaining of symptoms of that condition since her initial visit with Dr. Margules.

As a result of her submissions, the Plan requested that plaintiff have two independent medical examinations ("IMEs"), one for her psychiatric condition and one for her physical condition. As a result, on June 19, 2003, plaintiff saw Dr. Robert Reff for an independent psychiatric examination. Dr. Reff concluded that plaintiff's mental health treatment was inadequate and had likely always been inadequate, noting "that she had not been seen by a mental

health professional on a routine and regular basis at the level of intensity that her complained of condition would mandate." Dr. Reff's report also indicated that "complaints of fatigue and difficulty completing tasks are currently inconsistent with being able to perform the material duties of her job or any job." Finally, Dr. Reff indicated that there was evidence in the literature suggesting that an individual complaining of symptoms that might be considered fibromyalgia and depression would likely respond to the drug Effexor XR. Dr. Reff concluded that the most important thing is that she be treated by a physician specializing in psychiatry, and that she should have been seeing an individual psychotherapist at least once a week. Finally, Dr. Reff concluded that although plaintiff was currently unable to function in the workplace in any capacity, he believed that with appropriate treatment plaintiff would possess the capacity to return to work without restrictions or limitations.

On July 3, 2003, plaintiff was examined by Dr. Robert Katz, a rheumotologist. Dr. Katz reported that he saw no evidence of lupus, although plaintiff was still having quite a bit of pain, indicating that whatever syndrome she had was not in remission. He indicated that plaintiff's symptoms and physical findings were more consistent with fibromyalgia than with lupus, and that it was difficult to assess plaintiff's ability to work because of the subjective nature of fibromyalgia. Dr. Katz concluded that it was his "guess at this point" that plaintiff's subjective symptoms probably would make it difficult for her to return to work on a full time basis.

The Benefits Committee denied plaintiff's second appeal to reinstate LTD benefits, citing as support for that decision that: "treatment plans should be in place in cases of total disability; to support a decision for total disability the Plan requires that a participant be under the care of

physician; and [plaintiff's] care has been inconsistent at best and therefore fails to support a claim of total disability."

On September 17, 2003, IMC informed plaintiff that the Benefits Committee had determined that she was no longer entitled to LTD benefits under the terms of the Plan. Nevertheless, the Benefits Committee informed plaintiff that it was prepared to reconsider her appeal upon receipt, within 60 days, of documentation by her current treating physicians and, if different, those physicians who may have treated her since the date her LTD status was denied by Hartford; the complete diagnosis for which she was being treated; the recommended treatment plans and support showing that she had consistently and continually followed the treatment plan; and a comprehensive evaluation by her treating physicians of the IME reports, complete with clinical findings to support their position. Plaintiff failed to submit any additional documentation to IMC after the Benefits Committee's final decision.

## DISCUSSION

<u>Standard of Review</u>

The first, and perhaps most important, issue the court must decide is the standard of review the court should apply to plaintiff's claim for benefits under the Plan. Generally the court reviews a plan administrator's denial of benefits <u>de novo</u>, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989).

In the instant case, IMC is designated as Plan administrator, and under the terms of the Plan is given "full and complete authority, responsibility and control over the management, administration and operation of the plan, including authority to construe and interpret the plan, to

12

decide all questions of plan eligibility, to determine the amount, manner and time of payment of any benefits under the plan and to remedy ambiguities, inconsistencies, or omissions in plan terms and/or administration." In addition, the Plan provides that "all determinations of the Employee Benefits Committee in any manner arising under the Plan, including questions of construction and interpretation shall be final, binding and conclusive upon all interested parties, and shall be given the maximum possible deference allowed by law."

Although plaintiff admits that the Plan "contains a broad grant of discretionary authority" to the administrator, she nonetheless argues that this court should review the administrator's decision de novo. Relying on Wallace v. Reliance Standard Life Insurance Co., 318 F.3d 723 (7th Cir. 2003), she argues that decisions such as the denial of benefits made in the instant case are the type of mixed eligibility decision that the Supreme Court found in Pegram v. Herdrich, 530 U.S. 211 (2000), did not constitute fiduciary acts. Thus, according to plaintiff, if the denial is not a fiduciary act subject to the duties of 29 U.S.C. § 1104(a)(1) that the insurer act exclusively in the interest of Plan participants for the purpose of paying benefits, then ERISA does not allow the court to afford discretion to the insurer's decision.

Wallace provides no help to plaintiff. As defendant notes, Wallace merely held that an underwriting insurance company was not a fiduciary and thus not obligated to seek out additional evidence supporting a participant's claim. Id. at 724. Wallace recognized, however, that "managers, administrators and financial advisors of pension and welfare plans are fiduciaries." Id. Indeed, plenary review was accorded in Wallace "[b]ecause the policy does not confer interpretive discretion on [defendant]." Id. at 723.

Next, plaintiff argues that even if IMC was acting as a fiduciary with a clear grant of discretionary authority, plenary review is warranted because IMC had an inherent conflict of interest as both payer of claims and adjudicator of claim eligibility. In Firestone, the court stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115. As this quote demonstrates, the existence of a conflict does not provide for plenary review; it is merely one factor to be weighed in determining whether there was an abuse of discretion. Moreover, as this court has noted previously, see Newman v. UNUM Life Insurance Co. of America, 2000 WL 1593443 at *3 (N.D. Ill. 2000), the Seventh Circuit has held that arguments of an inherent conflict are alone insufficient to show actual bias. Instead, plaintiff must provide specific evidence of actual bias, which she has failed to do. Id. (citing Mers v. Marriot Int'l Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1020 (7th Cir. 1998). Consequently, the court concludes that its review of defendant's decision to deny long term benefits is under the arbitrary and capricious standard.

The arbitrary and capricious standard is extremely deferential, and a plan administrator's decision must be affirmed unless is it "clearly unreasonable." Hightshue v. AIG Life Insurance Co., 135 F.3d 1144, 1147 (7th Cir. 1998). "Under this deferential standard, the plan's decision to deny benefits is reviewed only to determine whether it was downright unreasonable." Id. (quoting Donato v. Metropolitan Life Insurance Co., 19 F.3d 375, 380 (7th Cir. 1994). If the decision made by the administrator "was made rationally and in good faith" the court will not second-guess whether the decision was right. Hightshue, 135 F.3d at 1147 (quoting Brown v. Retirement Committee of Briggs and Stratton, 797 F.2d 521, 529 (7th Cir. 1986).

Propriety of Decision to Terminate LTD Benefits

Plaintiff's challenge to defendant's decision rests predominately on the conclusions of the independent medical examinations. According to plaintiff, both Dr. Reff's psychiatric IME and Dr. Katz's physical IME report conclude that plaintiff was unable to return to work at the time of the decision to deny benefits. Although defendant does not necessarily agree with plaintiff's characterization of the IME reports, defendant's denial was not based on plaintiff's ability or inability to work, but on the conclusion that she no longer qualified for LTD benefits under the terms of the Plan. In particular, defendant concluded and continues to argue that: (1) plaintiff's current inability to work is not caused by either of her original disabling conditions, and (2) plaintiff has failed to comply with the "proper care and treatment" provisions of the Plan.

The Plan provides that, "if you cease to be disabled by the condition that originally disabled you, benefits will stop even if you are disabled by a different condition, if that second condition occurred after the original disabling condition." Plaintiff's originally disabling conditions were listed as lupus and depression. There is no question that at the time of the decision to deny benefits, lupus was not preventing plaintiff from working. No doctor, including Dr. Katz, the IME, or Dr. Margules, plaintiff's treating rheumotologist, had indicated that plaintiff's lupus was in any way preventing a return to work. Indeed, Dr. Katz saw no evidence of lupus at all. Although the court is concerned that plaintiff might have been misdiagnosed originally with lupus, when in fact she might have had fibromyalgia, plaintiff did not advance this point in the administrative appeals process, and the decision to deny LTD benefits based on lupus as a disabling condition cannot be categorized as arbitrary and capricious.

Plaintiff's other originally disabling condition -- indeed, her primary cause of disability -- was depression. Dr. Reff, the independent psychiatric examiner, diagnosed plaintiff with "major depression, recurrent, moderate severity." He noted that plaintiff complained of being unable to predict when she would be too tired to function or complete tasks, but he saw no evidence of this during his interview. Nonetheless, he concluded that, "absent visual observation that is inconsistent with what her reported activities are, [plaintiff] is currently unable to function in the work place in any capacity. Her complaints of fatigue and difficulty completing tasks are currently inconsistent with being able to perform the material duties of her job or any job."

Based on Dr. Reff's assessment, the only reasonable conclusion is that plaintiff was disabled due to depression at the time of the decision of the second appeal and, absent some other disqualifying factor, plaintiff was entitled to LTD benefits. Defendant thus resorts to the argument that the disqualifying factor was and is her failure to comply with the "Proper Care and Treatment" provisions in the Plan.

As noted, until April 22, 2002, the Plan, provided that "the plan may terminate your benefits if you no longer attempt to follow your physician's instructions regarding your disabling condition." On April 22, 2004, that provision was altered to become a "Medical Treatment While on Long Term Disability" provision, which provided that if "you are on LTD leave you are required to be under the care of a qualified health care provider. If you refuse treatment to improve your condition, or if other efforts to return to work are refused, your LTD benefits will terminate."

Defendant effectively demonstrates that the medical records show that plaintiff has continually refused appropriate care for her depression. Specifically, defendant points to Dr.

Reff's conclusion that plaintiff's mental health treatment "is currently and has likely always been inadequate." Despite being advised to the contrary, plaintiff has never been seen by a mental health professional on a routine and regular basis. Dr. Reff concluded that a psychiatrist should treat an individual who has remained impaired as a consequence of a psychiatric condition for as long as plaintiff had, and that she should have been seeing an individual therapist on a weekly basis during her disability.

Plaintiff takes issue with defendant's construction of the two Plan provisions, arguing that defendant has arbitrarily substituted the judgment of its doctors for that of the treating physicians as to proper care, and that plaintiff has never "refused" treatment. Defendant's construction of the Plan is entitled to significant deference given the court's conclusion that the arbitrary and capricious standard applies. Defendant has construed both provisions[2] to require essentially that claimant receive treatment for the disabling condition and follow the recommendations of the treating physician. Although plaintiff argues that the only purpose of the Proper Care and Treatment provision and its successor, was to confirm the presence of a disabling condition, the court agrees with defendant that the purpose of these provisions is and was to ensure that a disabled participant take appropriate steps to restore her health, if possible, and that the Plan avoid paying unwarranted benefits.

_____

[2]The parties agree that Seventh Circuit law is inconsistent on the issue of which version of the Plan's "treatment" provisions should apply in the instant case. Filipowicz v. American Stores Benefit Plans Committee, 56 F.3d 807 (7th Cir. 1995), suggests that the initial version, which was in effect when plaintiff first went on LTD, should be applied, while Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771 (7th Cir. 2003), which makes no mention of Filipowicz, holds that the version of the Plan in effect at the time benefits are denied must be applied. The court need not reach this issue because plaintiff failed to comply with either provision.

In the instant case, the medical records indicate, as Dr. Reff concluded, that plaintiff has never been continuously treated for depression. Indeed, her primary care physician, Dr. Margules, twice referred plaintiff to mental health care specialists, and each time plaintiff failed to follow the specialists' recommendations. Moreover, it appears that plaintiff's visits to mental health care providers were spurred by contact from defendant regarding her benefits. The four visits to Covenant Behavioral Clinic (two to Ms. Cunningham and two to Dr. Van Valkenburgh) came only after the call to plaintiff from Hartford inquiring about her mental health treatment. Again in February 2003, plaintiff saw Dr. Peters, two weeks after receiving the letter denying her appeal. She then saw Dr. Peters again, two weeks before submitting her final appeal. Thus, it appears that plaintiff's attempts at treatment for her depression are more closely linked to her claims for benefits than any efforts to improve her health. Accordingly, the court finds that defendant's conclusion that plaintiff was not complying with the proper care requirements of the Plan was not arbitrary and capricious.[3]

Finally, plaintiff argues that she should receive benefits based on Dr. Katz's conclusion that she was totally disabled due to fibromyalgia. Defendant's response is twofold: (1) fibromyalgia was not one of the two original disabling conditions; and (2) plaintiff's untreated depression was exacerbating the fibromyalgia. It is true, as plaintiff argues, that Dr. Margules indicated that plaintiff was "impaired by arthalgia of small joints of hands," at least as early as September 10, 2001, but he nonetheless at that time listed depression and lupus as plaintiff's only disabling conditions. It is also true, as defendant notes, that plaintiff was first

---

[3]The Seventh Circuit has defined "arbitrary and capricious" as defying all common sense. Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 838 (7th Cir. 2004).

diagnosed with fibromyalgia in February 24, 2003, by Dr. Trotter, who had examined plaintiff at the request of the Social Security Administration. Dr. Trotter's report was first sent to defendant on April 9, 2003, when plaintiff submitted her second appeal from the denial of LTD benefits. Thus, fibromyalgia was first identified by plaintiff as a disabling condition almost two years after plaintiff first applied for LTD benefits, and only after plaintiff had been denied LTD benefits. Although it is possible, as plaintiff argues, that her physical pain symptoms were caused all along by fibromyalgia, as mentioned earlier the court cannot conclude that defendant, was arbitrary or capricious in determining that fibromyalgia was not an original disabling condition.

In sum, this is a close case in which plaintiff has demonstrated that she was experiencing serious mental and physical conditions (depression and pain caused by either lupus or fibromyalgia) from the time she first applied for disability benefits. Although the court might have reached a different conclusion under a de novo standard of review, it cannot find that defendant acted arbitrarily and capriciously. Indeed, defendant provides two levels of appeal and obviously gave plaintiff's claims serious and thoughtful attention. Even in its final denial of her disability claims, defendant offered to reconsider if plaintiff were to provide specified additional support for her claim -- an offer of which plaintiff did not take advantage.

## CONCLUSION

For the reasons set forth above, the court concludes that defendant's decision to terminate LTD benefits was not arbitrary and capricious. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

**ENTER:**     **October 7, 2004**

Robert W. Gettleman
United States District Judge